Filed 12/19/13  In re B.D. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re B.D., et al., Persons Coming Under the Juvenile Court Law. | B244760 (Los Angeles County Super. Ct. No. CK95274) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. M.C., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Philip L. Soto, Judge.  Affirmed.

Law Offices of Vincent W. Davis & Associates, Linda M. Nakamura and Vincent W. Davis for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel and John C. Savittieri, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minors.

* * * * * *

M.C. (Mother), the mother of B.D. and Z.L., appeals from dispositional orders declaring her two daughters to be dependent children within the meaning of Welfare and Institutions Code[1] section 300 and removing them from her custody. Mother claims there was insufficient evidence to support jurisdiction based on Mother's alcohol abuse. We affirm.

## FACTS AND PROCEDURAL HISTORY

On August 31, 2012, the Los Angeles County Department of Children and Family Services (the department) filed a petition on behalf of 15-year-old B.D. and three-year-old Z.L. As sustained, the petition alleged Mother had a history of alcohol abuse and was a current alcohol abuser, which rendered her incapable of providing regular care for the children. On occasions in 2012, Mother was under the influence of alcohol while the children were in Mother's care and supervision. Mother had a criminal history of driving under the influence of alcohol. Mother's alcohol abuse endangered and placed at risk the children's physical safety.

The detention report indicated that B.D. was released to her father, Joel D. and Z.L. was released to her father, Jason L. Mother did not live with either of the fathers, who had joint physical and legal custody of their daughters.

The department received a referral on July 27, 2012 that B.D. was a victim of emotional abuse and general neglect by Mother, which placed Z.L. at risk. B.D. told the reporting party that Mother abused alcohol. On July 21, 2012, at about 3:00 a.m., B.D. returned to Mother's home with Claudia D., her stepmother. Claudia D. reported that they were returning home from a family celebration. She stated that when she and B.D. arrived at Mother's house, there was a party taking place. There were about 15 or 20 people, who appeared intoxicated, in Mother's house. She also observed that there were boxes of beer in the street and three or four males were drinking in the back of a truck.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

Claudia D. stated that when maternal Aunt Kelly approached her, Kelly appeared to be intoxicated, with watery eyes and slurred speech. Kelly said: "This is not [Mother's] fault; this is my fault."

In an interview conducted on July 27, 2012, B.D. related that on the night of the incident, she went back inside the house and asked everyone to leave the house. She got into a verbal altercation with Kelly's boyfriend. B.D. could not find Mother in the house, however, Mother arrived home with a group of women while B.D. was looking for her. B.D. left the house with Claudia D. and stayed that night with her.

Mother picked up B.D. from Joel D.'s house on July 22, 2012 at 1:30 p.m. B.D. said she could not smell alcohol on Mother's breath. But, while they were on the way home, Mother threw up in the car. Mother said it was because she had eaten cheese fries, but B.D. was worried that Mother threw up because Mother had been drinking.

When B.D. realized that the reporting party would contact the department, she stopped talking. B.D. had become parental towards Z.L. because she took care of her sibling. B.D. was concerned that Z.L. would be taken away from Mother, and she did not want the department to intervene again in the family.

The department intervened and removed the children from Mother to ensure the children remained safe and that concerns were addressed. The department was concerned because Mother had recently received voluntary maintenance services, which had only recently ended. Mother had resumed excessive drinking and remained in denial of having an alcohol abuse problem, which endangered the children's physical and emotional well being.

B.D. reported that after the voluntary family maintenance closed Mother would have "a beer or a couple of beers." Mother drank "'maybe one day out of the week,' and has '1, or 2, or maybe 3 beers.'" According to B.D., beer did not intoxicate Mother because she acted fine or normal with a couple of beers. Rather, the problem arose when Mother drank liquor. When Mother drank liquor, her eyes appeared closed and she lost her balance. B.D. denied that Mother drank in front of Z.L.

3

B.D. stated there was only one incident where she saw Mother drink and drive. According to B.D., it was a "long time ago" when she had been babysitting Z.L. and a child of one of Mother's friends. When Mother and the friend returned, B.D. knew Mother was "a little tipsy" so B.D. made Mother drink some coffee.

B.D. said Mother "hardly goes out" if B.D. and Z.L. are at home. Mother went out about once a week. If Mother went out, Z.L was with Maternal Grandmother, A.S. Z.L. was usually at Maternal Grandmother's house because Mother worked from 8:00 a.m. to 6:00 p.m., Monday through Friday. B.D. stated she wanted Z.L. to be safe. She referred to her own "'difficult childhood.'" B.D. did not want Z.L. "'to go through the same things'" that B.D. did. She stated that Mother's drinking and boyfriends were the difficult things. Mother's latest boyfriend was someone named Alex but B.D. was not sure if Mother and Alex were still together. He was not living with them and B.D. had not seen him since the voluntary family maintenance. Alex texted her sometimes but it was nothing inappropriate. Mother had boyfriends who came and went and most of them treated her well. B.D. stated she was worried about the referral because she did not want Z.L. removed from Mother's home. B.D. was upset by her father's reaction to the current incident. B.D. was fine about going to Mother's house and thought her father was "'very overprotective.'"

In an interview on July 27, 2012, B.D.'s father said Mother "'doesn't grasp it.'" He thought B.D. was worried about Z.L., was confused and protective of Mother. A part of B.D. wanted to be at Mother's house because she "'want[ed] to be a party animal, just like [Mother].'"

An emergency response case social worker, Dilhara Fernando, who investigated a June 2012 referral of neglect against Mother was interviewed. Fernando reported that her impression of Mother was that she drinks, but not around the children. She did not think Mother got drunk around the children. Mother took Z.L. to the Maternal Grandmother's house when Mother went out. There were "definite custody issues at play." Fernando

4

could not prove anything so the referral was closed. All parties had been very cooperative.

Mother was interviewed on July 31, 2012 and reported she had a DUI conviction in 2005. Mother took classes and attended Alcoholics Anonymous meetings. She was arrested in 2011 on an outstanding warrant for the DUI conviction because she had not finished paying the fine. Mother had "recently" completed paying the fine so there were no outstanding arrest warrants.

Mother denied having a problem with alcohol, but said, "'honestly now, I'm scared to be around it.'" Mother volunteered, "'[a]fter all of this, I've come a long way.'" Mother said she "drink[s] on occasion," but if she was going to drink, she did it when the children were gone. She said she had only drank a handful of times in the preceding five to six months and when she drank an average of two alcoholic beverages during or after dinner, she felt "'a little buzzed, because [her] tolerance isn't there.'"

Mother indicated that on the day of the incident, she went out in the evening. B.D. told her she might spend the night with her father because they were getting home so late. Mother said her sister Kelly had a key to Mother's house and invited people over without Mother's knowledge. Mother said she was asleep in the back of the car because they had to wait so long at Jack in the Box. She had two drinks at dinner that night, one beer at a party and denied being drunk. Mother fell asleep because she was tired. She wished Claudia D. and B.D. had seen her in person so they would have seen that Mother was not drunk. Mother denied being hung over when she vomited the next day. Mother said she would not do anything to jeopardize her children. Mother said she made it a point not to drink around them. B.D. had told Mother that B.D. would be late so she figured B.D. would not be coming home. Mother submitted to an on demand drug/alcohol test on July 31, 2012 and tested negative.

Jason L. confirmed that Z.L. was with him on the night of the incident. He said that he did not feel that Z.L. was 100 percent safe with Mother. Around July 4, 2012, Z.L. told her stepmother, Deanna L., that Mother was drinking beer. Jason L. was

5

concerned about the different people coming in and out of Z.L.'s life such as different boyfriends and about Mother's judgment in whom she chose to have around the children. When Jason L. was in a relationship with Mother, she would be so intoxicated at times that he had to care for B.D. and Z.L. by himself. Jason L. felt better when B.D. was present because she looked out for Z.L., who was too young to care for herself.

Jason L. ended his two-year on and off again relationship with Mother because of her drinking and desire to go out and party. He reported that one drink was never enough for Mother. Although Mother did not drink every day, when she did drink, it was to the point of excess. During the voluntary family maintenance period, Jason L. was concerned about Mother's appearance at times when they were exchanging Z.L. Mother looked as though she had been out all night. When he reported Mother to the prior caseworker, the issue was cleared up and Mother began to look appropriate during the exchanges. Jason L. knew that B.D. had to take care of Mother in the past. He was worried about Mother's judgment when she drank because she allowed various men into the children's lives. B.D. and Z.L. might be targeted or abused by others because Mother allowed into the house unknown people who drank excessively.

At a team decision making meeting on August 24, 2012, both fathers continued to express concern that Mother's drinking had been an ongoing issue. Joel D. reported that he had known Mother since she was 15 or 16 years old. After they had been married about three or four years, Mother's drinking got worse. Mother hid her drinking from Joel D. Early in their marriage, Mother was intoxicated and wrecked the car but she denied that she was intoxicated.

Mother claimed she did not have a drinking problem. Mother said she had "'made mistakes in the past,'" but since the voluntary family maintenance was opened, she had not made mistakes. Mother thought that the department continued to receive referrals because Jason L. wanted custody of Z.L.

One of Mother's friends, who was interviewed on August 24, 2012, asked if it was okay if she did not answer some of the questions. The friend said she had known Mother

6

six or eight years. The friend knew Mother pretty well. The friend was with Mother on July 21, 2012. The friend had no concerns about the children when they were in Mother's care.

B.D.'s former therapist, Kelly Anderson, said B.D. was supposed to receive individual therapy during the voluntary family maintenance period but she never enrolled. B.D. agreed to individual therapy after the case closed. B.D. told the therapist that she was concerned that Alex was coming to the home again after the case closed. B.D. thought Alex was a bad influence on Mother and noticed Mother's behavior changed when Alex was around.

The social worker, who supervised Mother's voluntary family maintenances services, was interviewed. The social worker reported that Mother had been compliant and had done well. However, the department continued to receive referrals about Mother. The social worker said Mother "seemed to be 'up to her old ways again.'"

At the team decision making meeting, it was discussed that removal of the children from Mother's custody might be warranted because of the department's concern that Mother had an alcohol problem, which she denied. It was also discussed that the department had provided Mother with voluntary family services, just months prior, but was continuing to receive referrals for the same concerns. The children were subsequently removed from Mother's custody and placed with their respective fathers.

Mother had two prior referrals. On September 6, 2011, the department received a referral that B.D. was at Mother's home, when Mother was passed out in the bathroom. B.D. had to take care of Mother. Prior to passing out, Mother had an argument with her live-in boyfriend Alex, who had anger problems. Mother and Alex had been out partying and he left. A friend drove B.D. and Mother home. Mother had been drinking and then went into the bathroom where she passed out. B.D. said Mother partied every weekend. On one occasion, B.D. missed school because she had to watch Z.L. While the referral was being investigated, Mother was arrested for an outstanding warrant. Mother was asked to drug test on Tuesday November 1, 2011. Mother said she did not drug test on

7

that date because she was arrested on a warrant for an old DUI conviction from 2005. However, Mother was not arrested until 10:13 p.m. that date, which indicated Mother intentionally did not drug test.

The September 6, 2011 referral alleging general neglect was substantiated and resulted in a voluntary family maintenance case. Mother was required to randomly drug test, attend Alcoholics Anonymous meeting, and participate in individual counseling and in a family preservation program. The family received voluntary family maintenance services from November 2011 through May 2012.

On June 14, 2012, the department received a referral alleging general neglect and emotional abuse of the children. The caller observed a lot of beer cans on Mother's front porch. Mother resumed drinking as soon as the voluntary family maintenance case closed in May 2012. Alex also moved back into Mother's home after the case closed. Mother did not pay attention to the children when she drank. B.D. took care of Z.L when Mother was drunk. Mother's mood and temperament changed when she drank. Mother's mood was up and down and she slept late in the day. Mother stayed up late partying and allowed the children to stay up late. Mother allegedly took the children with her while she was drinking and partying. Mother had a purple bruise on her chest. The caller thought that Alex had caused the bruise. Because Mother and B.D. denied the allegations, the June 14, 2012 referral was closed as unfounded.

On August 31, 2012, the juvenile court ordered the children detained from Mother and released to their respective fathers. The court ordered Mother monitored visits with the children with discretion for the department to liberalize visits to unmonitored visits with B.D. but not Z.L.

In September 2012 for the jurisdiction/disposition hearing, the department reported that B.D. was interviewed about Mother's alcohol abuse. B.D. stated that about 10 years ago, "'it was not fun growing up with [her] mom.'" B.D. had "'seen things'" she should not have seen. B.D. said, "'I am not supposed to take care of my mom and not see things.'" Mother's boyfriends would come and go. B.D. did "'not think any

8

child should see their mom drunk.'" Mother would get emotional and her eyes would get drowsy. Mother's speech would be slurred and Mother would be stumbling. According to B.D., Mother had been doing this since B.D. was five years old. B.D.'s first memory was when she was six and living with Maternal Grandmother. B.D. woke up around 2:00 a.m. and could not find Mother. B.D. called Joel D., who picked her up. The next day, Mother blocked Joel D.'s number so that no telephone calls to Joel D.'s number could be made from the house.

B.D. said she would see her family drinking and just grew up around it. Mother went out a lot after her parents were divorced. When she was six years old, B.D. remembered that when Mother came home, she knew Mother had been drinking. Mother would drink in front of B.D. Mother would leave Z.L. with Maternal Grandmother.

When B.D. was about nine years old, Mother's then boyfriend, Victor, would hit Mother. B.D. never saw Victor hit Mother. However, B.D. heard Mother tell Victor, "You do not have to hit me." When B.D. went into the room and threatened to call the police, Victor left. B.D. explained that Joel D. misunderstood because he thought B.D. said that Mother said Victor did not have to "rape" Mother.

When B.D. was about twelve years old and at her softball trophy ceremony, Mother and other parents had been drinking. Mother's words were slurred and she got very emotional. B.D. told Mother to stop drinking. B.D. subsequently called her father, and told him what happened. When Joel D. arrived, Mother became more emotional and started crying. Mother raised her voice causing B.D. to start crying. Mother asked B.D. why she was doing this to her. B.D. thought Mother "'does not understand.'"

Sometime in 2009 or 2010, Mother and her friends came home from a club. Mother had been drinking at the club. B.D. did not think Mother was drunk but knew Mother had been drinking. B.D. did not want Mother to drive because Mother "'was tipsy like she drank one too many.'"

On a different occasion, B.D., Mother, Alex and others went out to a restaurant. Mother had two martinis. Alex then drove them to a friend's house and Mother

continued to drink until she could not take care of herself. Mother's eyes were drowsy; Mother was mumbling things and her speech was slurred. B.D. said that she could tell Mother was drunk. Mother went into the restroom. B.D. subsequently tried to get Mother out of the restroom. When Mother finally opened the door, she was sitting on the floor. Alex and B.D. had to pick up Mother and put her on a couch. B.D. went outside at 2:00 a.m., crying and wishing she was somewhere else. Alex put Mother in the car and drove them home. Alex put Mother to bed and B.D. removed her shoes. B.D. stated: "'I want this to go away. I do not want any more social workers. I want to go home with my mom and go back the way it was. I miss [Z.L.] and seeing her on the weekends is not enough. If [Jason L.] keeps [Z.L.] I will not be able to see her again.'"

Mother denied statements by Joel D. that she was intoxicated when she was in the car accident. According to Mother, she had a "fender bender" because she was "emotional" after Joel D. called and told her he was in urgent care with B.D. Mother denied being drunk in the park. Rather, B.D. wanted to leave and called Joel D. to pick her up from the park. Mother admitted she had a drink earlier at the park; but they "'had been there all day and it started in the morning.'" Mother said it had nothing to do with her not being able to drive. Mother denied that she passed out in the bathroom of a friend's house. Mother made the following statement: "'That day we did go out to dinner and we did have a couple more drinks at my friend's house and I did go to the restroom and it was late and I was tired and I came back out and decided it was time to go home.'"

Mother stated she "'would drink on social events.'" This would happen when she did not have to take care of the children. She would drink "'[a] couple of beers throughout the weekend.'" Mother denied drinking in front of the children. She drank in front of B.D. "'years ago, but nothing in the last year or maybe longer.'" Mother added "'[n]ot a lot like two or three beers.'" Mother claimed that when she drank in front of B.D. years ago, she "'made it an issue not to do that again.'"

10

Mother said that when the July 21, 2012 incident occurred neither child was in her care. Mother was not certain that B.D. was coming home. B.D. said she left Mother's home that night because "'my sister and my friend[s] were home drinking and I told her that it was okay and I would pick her up the next day and figure out what was going on.'"

Mother stated she did not believe she needed additional services and had complied with the voluntary family maintenance case "'in a timely fashion.'" The voluntary family maintenance case worker thought Mother was "'one of the dream clients.'" Mother enrolled in an outpatient alcohol treatment program after the petition was filed. She tested negative for drugs and alcohol on July 31, 2012 and September 10 and 19, 2012.

Joel D. said that B.D. was three years old when Mother had the accident. Mother was sitting in the car. He could smell that she was intoxicated but Mother denied being intoxicated. However, she tried to get out of the car and could not stand. Mother passed out. During the time they were married, Mother would come home intoxicated; Joel D. could smell alcohol on Mother but she denied it. According to Joel D., he "'had to deal with her alcohol and lying and being intoxicated for two years.'" He confirmed B.D.'s statements about the softball game. He also stated that Mother was a heavy drinker and that both maternal grandparents and family were heavy drinkers. They drank every day and at all hours of the day. B.D. told Joel D. that Mother had a boyfriend who smoked marijuana. In May or June 2012, B.D. told Joel D. that Mother was at someone else's home drunk. Mother urinated on and threw up on herself. According to Joel D., B.D. heard Mother say to her then boyfriend "'What are you going to rape me now?'" As previously noted, according to B.D., she said Mother said "hit" not "rape."

Joel D. stated, "'[Mother] has a problem with alcohol and she has always denied it. She needs to get help and realize that her drinking and relationships affect [B.D.]. I do not want to take [B.D.] away from her, but this cannot keep going on. I am worried about [B.D.] and worry that from her drinking that something will happen to [B.D.].'"

Claudia D. confirmed incidents where B.D. called Joel D. to pick her up when Mother was drunk. B.D. called Joel D. once when Mother was drunk and wearing a

11

bikini and high heels. B.D. also called Claudia D. about an incident where Mother passed out on the bathroom floor at the friend's home. Claudia D. also said Mother was on "My Space" and in every picture Mother had a drink.

Jason L. said Z.L. looked like a homeless person when she visited him. He had seen Mother drunk and fight with family members. The first and second time they met she looked intoxicated. Mother would drink "'to the point of just being drunk.'" In May 2008, Mother got drunk at a party and started to pull her top off. Jason L. told Mother to stop because B.D. was watching her. Mother vomited in the car on that date and had to be carried to bed when they arrived home. Jason L. thought Mother allowed "'herself to look pretty bad in front of [B.D.].'"

When Z.L. was only a few months old, Jason L. would visit her. Mother came in with a twelve pack of Corona and three packs of tall cans of Bud Light for Maternal Grandmother. Mother looked "definitely" drunk and stumbled. Maternal Grandmother came and told Mother to let her take Z.L. Jason L. told Mother, "'You're ridiculous.'"

On May 16, 2010, Mother arrived to pick up Z.L. from Jason L. Mother arrived with her friends and a maternal aunt. Mother got out of the car, wobbling, laughing, and hanging on to her friends. In 2011, Mother threw one of Z.L.'s soiled diapers and wipes on Jason L.'s lawn. His wife, Deanna L., said Mother had glassy eyes and looked like she had been out partying all night. Mother told Jason L. that her relationship with Alex was violent. Alex purportedly carried guns and stabbed people. Jason L. observed Alex sleeping on Mother's sofa in May 2012. He observed beer cans on Mother's front porch in June 2012. Jason L. said Mother's "'drinking has always been a problem.'" Mother would be all right as long as the department was involved but would go back to her party ways once the department closed the case.

An unidentified person said that Mother was not passed out drunk in July 2012. She thought Mother was a really good mom, who did anything for her girls. She denied that Mother went out with the children. She thought the fathers were upset over having

12

to pay child support. The unidentified person denied that Mother drank in the children's presence; however, the person said she was not always with Mother.

Maternal Aunt, Berenice M. said that B.D. was not telling the truth. Berenice said Mother is not an alcoholic because Mother does not drink every day. Berenice described Mother as a social drinker.

Mother's friend Livier G. said Mother was a social drinker and did not drink in front of the girls. She drove Mother home on July 21, 2012. They did not know that anyone was going to show up at Mother's home.

The department recommended removal from Mother's care and family reunification services based on Mother's history of alcohol abuse including a DUI criminal conviction, witness statements, the July 21, 2012 incident and Mother's denial of an alcohol problem.

In an addendum report, filed on September 28, 2012, the department reported that Jason L. elaborated on incidents when Mother appeared to have been drinking. Mother was often late or not home when it was time to exchange Z.L. Mother failed to provide a change of clothes for Z.L. when she was left with Maternal Grandmother. Mother also dressed Z.L. in tattered clothing or in clothing that was too small. Mother also continued to place Z.L in diapers when it was no longer necessary. Jason L. thought Mother's drinking affected her ability to take care of Z.L. and resulted in neglecting her.

Maternal Aunt Y.B. said Mother loves her children. Mother goes to church. Mother is hard working. She did not know about the accusation; but, she knew Mother was trusting in God right now.

At the jurisdiction hearing, Mother submitted on the department's reports to the juvenile court. The court sustained the petition as amended. The court set the matter for a contested disposition hearing. The children remained placed with their respective fathers.

In an October 2012 interim review report, the department recommended that physical custody of the children be removed from Mother. The department also

13

recommended that Mother be ordered to: participate in individual and conjoint counseling with the children if the therapist deemed it appropriate; complete a parenting program; and submit to weekly alcohol testing.

At the contested disposition hearing, Mother called the dependency investigator as a witness. The investigator testified that he assessed the children to be in substantial danger of harm if they were returned to Mother's custody. His assessment was based on statements from B.D. and the fathers, a review of the voluntary family maintenance case, and Mother's criminal history. He testified that Mother was participating in an outpatient Alcoholics Anonymous program, a parenting program and drug and alcohol testing. He was not aware of the exact number of Mother's negative alcohol tests; however, he had documentation that Mother had tested negative once and had no positive tests. He did not contact Mother's alcohol counselor to ascertain her attendance and progress.

Mother testified that she was currently participating in alcohol counseling, Alcoholics Anonymous meetings, and parenting classes. Mother submitted to drug and alcohol testing through the department and the alcohol program.

Mother testified that she was a "recovering alcoholic." Mother meant by "recovering" that she had "accepted that perhaps there is a problem." Mother was "taking the steps to correct it and make sure that it doesn't happen again." Mother had her last drink in July 2012. When Mother previously tried to address the alcoholism, she "didn't think it was as significant. I mean I didn't think it was a problem."

The department counsel wanted to call B.D. to testify about why she terminated a recent visit with Mother. However, the juvenile court ruled that B.D. did not have to be called because she was old enough to know if she wanted to leave a visit.

The children's counsel argued for removal from Mother's custody and unmonitored visits between Mother and B.D. and monitored visits for Z.L. Mother's counsel asserted the children should not be removed from Mother's care because the department had failed to prove by clear and convincing evidence there was a substantial risk of danger to the children. Mother was participating in programs which the

14

department had not investigated. There were a number of safety measures in place to protect the children if they were returned to Mother. The measures included: court supervision; the department's involvement; B.D.'s age and ability to report if Mother did have problems; and the fathers' interacting with their children and Mother. Counsel asserted there were less restrictive alternatives to removal given Mother's participation in programs to address her now admitted alcoholism. Fathers' attorneys both joined the department's recommendations. Both fathers indicated that Mother had problems with alcohol which needed to be addressed before the children were returned to Mother. B.D.'s father did not think unmonitored visits should be granted until Mother showed consistent sobriety for at least six months.

Prior to ruling on the matter, the juvenile court made the following statement. "Notwithstanding, when you step back and you look at the picture as a whole, it is a situation with Mother who has got a chronic alcoholism problem. This is an incident that happened late July of this year. So not even three months ago. And this problem has been going on for many years as demonstrated by statements from the child, [B.D.], that are in the initial report and the disposition report. And not only was Mother in July not facing up to the problem. Instead saying that, you know, she went to Jack in the Box or some fast food place and fell asleep in the car and things of that nature. The place was with many strangers in the house, beer and alcohol in the house, open containers available to her as well as everybody else. They are obviously having a pretty good party at the house."

The juvenile court also indicated Mother's relatives and friends all thought nothing was wrong and wanted to cover up for Mother. The court commended Mother for her admission of alcoholism. The court also credited Mother with having all negative tests since July 2012. However, the juvenile court stated: "But three months of negative tests do not negate all the years of the alcohol problem that an adult taking care of young children, a 16-year-old, a three-year-old, has to deal with in order to make sure that they are safe." The court stated its concern was the children's safety not just to return the

children to Mother. The court stated it was judging whether the children would be safe in Mother's home "not knowing whether or not [she was] going to crack open [her] next brewski and fall off the wagon." The court told Mother that, if she was really interested in sobriety, the court supported her. The court did not support Mother if she was just interested in getting the children back and keep doing what she was doing before the incident.

The juvenile court then found by clear and convincing evidence the children were dependents and returning them to Mother's custody would create a substantial risk of harm. The court ordered the children removed from Mother's custody. The children were placed in the homes of their respective fathers. Mother was given monitored visits. Mother was ordered to: attend a drug/alcohol program with random weekly testing; participate in a 12-step program; and complete a parenting program. Mother filed a timely notice of appeal from the dispositional order.

## DISCUSSION

Mother claims the jurisdictional finding is not supported by substantial evidence that the children were presently at a substantial risk of harm due to her alcohol abuse. The juvenile court's jurisdictional and dispositional findings are reviewed for substantial evidence. (*In re Mariah T.* (2008) 159 Cal.App.4th 428, 438; *In re P.A.* (2006) 144 Cal.App.4th 1339, 1344.) We review the determination in a light most favorable to the challenged order resolving all evidentiary conflicts in favor of the order. (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 450–451*; In re Casey D.* (1999) 70 Cal.App.4th 38, 52–53.)

The primary purpose of dependency statutes is to protect children by safeguarding their physical and emotional well-being. (§ 300.2; *In re Nolan W.* (2009) 45 Cal.4th 1217, 1228; *T.W. v. Superior Court* (2012) 203 Cal.App.4th 30, 42–43.) Section 300.2 provides in that respect: "Notwithstanding any other provision of law, the purpose of the provisions of this chapter relating to dependent children is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and

physical and emotional well-being of children who are at risk of that harm.  This safety, protection, and physical and emotional well-being may include provision of a full array of social and health services to help the child and family and to prevent reabuse of children.  The focus shall be on the preservation of the family as well as the safety, protection, and physical and emotional well-being of the child.  **The provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child.  Successful participation in a treatment program for substance abuse may be considered in evaluating the home environment.**  In addition, the provisions of this chapter ensuring the confidentiality of proceedings and records are intended to protect the privacy rights of the child." (Boldface added.)

The record contains overwhelming evidence that Mother's home was not free of the negative effects of alcohol.  Mother has a history of alcohol abuse which dates back to B.D.'s early childhood and has encompassed Z.L.'s entire life.  Mother had a 2005 DUI criminal conviction.  Mother did not complete the probation for the conviction, which led to a November 2011 bench warrant arrest.

Both fathers disclosed that Mother's drinking problem was ongoing.  Joel D. said that Mother, who was then 33 years old, had been drinking excessively since she was around 20 years old.  While they were married, Mother was involved in a car accident where she was driving while intoxicated.  B.D. was about three years old at the time. According to Joel D., Mother and her entire family were heavy drinkers.  B.D. stated "I would see my family drinking and I just grew up around it."  B.D. did not want Z.L. to "go through the same things."

B.D. talked about how her childhood was marred by Mother's consumption of alcohol.  She recounted early childhood incidents where Mother was drunk, passed out, throwing up, yelling at B.D., mumbling to herself, talking with slurred speech, stumbling, and unable to care for herself.  B.D. and others would have to put Mother to bed.  B.D. also would have to periodically call Joel D. to pick her up when B.D. was not

17

comfortable getting into the car with Mother after she had been drinking. B.D. said she had seen things she should not have seen. In numerous statements, witnesses disclosed Mother's alcoholism had resulted in B.D. having to be the family caretaker including caring for Mother when she was drunk.

Jason L. stated that when he met Mother she was drinking. Mother would just keep drinking until she got drunk. He also provided a number of examples of Mother's lack of care and neglect of Z.L. during their exchanges. Mother arrived late for the exchanges of Z.L. At times, Mother was drunk during the exchanges. Mother dressed Z.L. in tattered clothing which did not fit.

There was evidence that Mother's judgment including her selection of male companions also placed the children at risk. Two of the companions hit Mother and one smoked marijuana in Mother's home in the children's presence. B.D. was unable to return home on July 21, 2012 because of Mother's drinking. When B.D. arrived home at 3:00 a.m. from a paternal family function, Mother was nowhere to be found. Yet, Mother's home was full of intoxicated people that B.D. did not know. When Mother eventually returned home, she was passed out in the back of a car.

Moreover, the record demonstrates that Mother's participation in court ordered programs for three months including negative alcohol tests do not require a different result. When the July 21, 2012 incident occurred, Mother had just completed two months of a voluntary family maintenance program. Mother also continued to consume alcohol after her 2006 criminal conviction and completion of an alcohol treatment program. Mother continued to deny she had a drinking problem up to and including the October 2012 disposition hearing where Mother testified she had "accepted that perhaps there is a problem." The juvenile court's determination the children were at substantial risk of harm by Mother's alcohol abuse was supported by substantial evidence.

18

**DISPOSITION**

The orders under review are affirmed in their entirety.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J. *

FERNS

We concur:


_____, Acting P. J.

ASHMANN-GERST


_____, J.

CHAVEZ

---

\*　Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19